

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **HEATHER BOTTUM,**<br>c/o Friedman & Gilbert<br>50 Public Square, Ste 1900<br>Cleveland, OH 44113<br><br>　　　Plaintiff,<br><br>-vs-<br><br>**CUYAHOGA COUNTY,**<br>**FEBEN YESHAK,**<br>**MATT SCHWARTZ,**<br>**WARDEN ERIC IVEY,**<br>**NURSE COOPER,**<br>**RONITA SANDIFER,**<br>**CPL. WALSH,**<br>**FREDERICK BARTHANY,**<br>**BARRY HICKERSON,**<br>**PHILLIP CHRISTOPHER,**<br>**ROBERT MOORE,**<br>**DERRICK KENDALL,**<br>**C.O. CARDWELL,**<br>**MICHAEL SHAW,**<br>**JERMAINE CLEMENTS,**<br>**S.R.T. C.O. SMITH,**<br>**CPL. BRUNELLO,**<br>**WILLIAM WINKEL,**<br>**JAMES SPIRAKUS,** AND<br>**NURSE JONES**<br>c/o Cuyahoga County Law Department<br>2079 East 9th Street,<br>Cleveland, Ohio 44115,<br><br>　　　Defendants. | Case No.<br><br>Judge<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     This is a civil rights action. This case seeks damages arising out of trauma and injuries suffered by Plaintiff Heather Bottum while in the custody of Cuyahoga County in February and March 2018.

2.     When she entered the Cuyahoga County Jail as a pretrial detainee, Plaintiff Heather Bottum was in a very vulnerable state, living with serious mental health issues and related needs. Heather desperately needed quality mental health treatment and appropriate support. Heather Bottum's mental illness renders her disabled.

3.     Rather than protect Heather Bottum while in their care and custody, Cuyahoga County Jail staff subjected her to various abuses—including assaults at the hands of correctional officers, discriminatory use of solitary confinement, and retaliatory use of restraint chairs—in violation of her constitutional rights. Correctional staff abused Heather and used retaliatory discipline against her even though her mental health crisis was obvious and documented. Heather was discriminated against, and was excluded from participation in and denied the benefits of services, programs, and activities in the Cuyahoga County Jail because of her psychiatric disability.

4.     As a result, Heather Bottum suffered and continues to suffer severe injuries, which are the result of Defendants' unconstitutional, willful, wanton, and/or reckless conduct.

5.     The Cuyahoga County Jail, also known as the Cuyahoga County Corrections Center (CCCC), operates under a state of constant crisis, endangering the health and safety of Detainees/Inmates and staff alike on a daily basis.  CCCC is underfunded, understaffed, poorly administered, and intentionally overcrowded, giving rise to a chaotic and perilous environment inside the jail walls. Detainees and Inmates, including Heather Bottum, are subjected to ongoing

patterns of unconstitutional conditions of confinement within CCCC, including violations of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act (ADA), and the Rehabilitation Act. Defendants have long been on notice of the horrific conditions and constitutional deprivations occurring daily at CCCC, yet have failed to timely or effectively remedy the deplorable state of affairs.

6.    Defendant Cuyahoga County is also liable for the damages suffered by Heather Bottum. Cuyahoga County's unconstitutional policies, practices, and customs in place at the time of these incidents are the moving force behind the misconduct committed by Defendants.

### JURISDICTION AND VENUE

7.    This action arises under the laws of the United States, and jurisdiction is conferred on this Court under the Constitution of the United States; the Civil Rights Act (42 U.S.C §1983, et seq.); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1343 (civil rights); 42 U.S.C. § 12131 (the "Americans with Disabilities Act"); §504 of the Rehabilitation Act of 1973; and 29 U.S.C. § 794.

8.    Supplemental jurisdiction over Plaintiff's related state law claims is invoked pursuant to 28 U.S.C. §1367.

9.    Venue in the Northern District of Ohio is proper under 28 U.S.C. § 1391(b), because it is the district in which many if not all of the defendants reside, and because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

### PARTIES

10.    Plaintiff Heather Bottum is a citizen of the United States and of the State of Ohio, and a resident of Cuyahoga County.

11.     Defendant Cuyahoga County ("the County") was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio residing in the Northern District of Ohio acting under the color of law. Defendant Cuyahoga County is a "person" under 42 U.S.C. § 1983. Defendant Cuyahoga County is the employer and principal of Defendants Yeshak, Schwartz, Ivey, Cooper, Sandifer, Walsh, Barthany, Hickerson, Christopher, Moore, Kendall, Cardwell, Shaw, Clements, Smith, Brunello, Jones, Winkel, and Spirakus and is responsible for the policies, practices, and customs of the Cuyahoga County Corrections Center ("CCCC").

12.     Defendant Cuyahoga County is responsible for ensuring that all of its facilities, including CCCC, are in compliance with federal and state law, department or agency policies, rules, and regulations, and related standards of care.

13.     Defendant Cuyahoga County is a public entity within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131(1).

14.     Defendants Correctional Officer Feben Yeshak, Corporal Matt Schwartz, Warden Eric Ivey, Correctional Officer Ronita Sandifer, Corporal Walsh, Correctional Officer Frederick Barthany, Correctional Officer Barry Hickerson, Sergeant Phillip Christopher, Corporal Robert Moore, Correctional Officer Derrick Kendall, Correctional Officer Cardwell, Correctional Officer Michael Shaw, Correctional Officer Jermaine Clements, Special Response Team Correctional Officer Smith, Corporal Brunello, Correctional Officer William Winkel, and Correctional Officer James Spirakus were, at all times relevant to the allegations made in this complaint, duly-appointed correctional officers employed by Cuyahoga County, acting within the scope of their employment and under the color of state law. They are sued in their individual capacities.

4

15.     Nurses Cooper and Jones were, at all times relevant to the allegations made in this complaint, nurses in CCCC and was agents of Cuyahoga County, acting within the scope of their employment and under the color of state law. They are sued in their individual capacities.

16.     At all times relevant hereto and in all their actions described herein, the Defendants acted under color of law and pursuant to their authority.

17.     At all times relevant hereto and in all their actions described herein, the Defendants acted within the scope of their employment and in the performance of their official duties.

FACTS

18.     Heather Bottum, who is 47 years old, is a member of a tight-knit family, including her sister and father, and is the mother of one son.

19.     Heather struggles with serious mental illness. Her struggle has gone on for some years and she has at times suffered from psychosis and been found legally incompetent. Heather's family is supportive and loving, and she continues to work toward stability and wellness.

20.     However, while in the midst of mental health crisis in early 2018, Heather was held as a pretrial detainee in the custody of Cuyahoga County.

21.     While in the County's custody, Heather Bottum was subjected to discriminatory and unconstitutional use of solitary confinement, multiple physical assaults, and retaliatory use of the restraint chair, among other constitutional violations and misconduct. Those events and relevant circumstances are as follows:

**February 8, 2018**

22.     On January 30, 2018, Heather Bottom was in the custody the City of Lakewood, having been arrested by Lakewood police. While in custody, with Heather in the midst of mental

health crisis, Lakewood officers alleged that Heather committed the crime of "Harassment by an Inmate."

23.     The case was submitted to the Cuyahoga County Grand Jury. On February 7, 2018, the Grand Jury indicted Heather for "Harassment by Inmate" in violation of Ohio Rev. Code. § 2921.38(A).

24.     On February 8, 2018, Heather was transferred by the Lakewood Police and booked into the Cuyahoga County Jail (also known as the Cuyahoga County Corrections Center, hereinafter "CCCC").

25.     Defendants Correctional Officers Feben Yeshak and Matt Schwartz conducting intake were briefed that Heather required a mental health screening upon intake because of her apparent serious mental health issues.

26.     Defendants transported Heather to the medical unit for her intake screening, and then to the Mental Health Unit for an evaluation.

27.     Heather, who was in a mental health crisis at the time, exchanged words with medical staff.

28.     Nurse Cooper cleared Heather to be placed in general population. Cooper then determined that Heather should be placed in lockup—or solitary confinement—saying that she did not like Heather's attitude.

29.     Defendant Yeshak prepared to escort Heather to Pod 4F in Jail 1.

30.     Heather tried to report that she had bruises on her body from being in custody at Lakewood. Defendants refused to document her injuries.

31.     Defendant Schwartz placed Heather in handcuffs and gave her verbal commands to settle down. Defendant Schwartz reported that Heather complied with those orders.

32.     Heather was afraid and felt that Defendant Yeshak was being aggressive and asked for Defendant Corporal Schwartz to follow them to document the escort.

33.     Yeshak and Schwartz began to escort her to her pod.

34.     As Yeshak held onto Heather and escorted Heather through CCCC and approached 4F Pod, Heather was upset and complained about the correctional staff's failure to document her bruises.

35.     Defendant Yeshak yanked up on Heather's handcuffs and slammed her into the glass wall of a "bullpen" holding cell they were passing.

36.     This assault is documented by both Yeshak and Schwartz in their combination reports dated February 8, 2018.

37.     Defendant Schwartz, who was present during this assault, failed to prevent Yeshak from slamming Heather into the glass. Defendant Schwartz failed to intervene to prevent this excessive force event though he both observed or had reason to know excessive force was being used and had the opportunity and the means to prevent it.

38.     Heather suffered pain and injury as a result of this excessive force event. Her neck, upper back, and right side was injured, and remain affected today.

39.     Yeshak and Schwartz did not stop to see if Heather was okay. They forced Heather to keep walking.

40.     Heather was upset and shaken by Yeshak's assault, and upon entering her cell in the Mental Health Unit, she yelled at the officers.

41.     Schwartz ordered Heather to be placed in a restraint chair. He said, "Lock her up and never let her out."

42.     Schwartz reported that Heather was ultimately secured without further incident.

43.     Though there was no further incident, Heather remained in the restraint chair for approximately two and one-half hours—causing her physical and emotional pain and suffering—until Mental Health Unit Nurse Lagreca evaluated and removed Heather from the chair.

44.     There was no lawful basis to use the restraint chair under these circumstances, and its use was punitive, retaliatory, and discriminatory on the basis of Heather's disability, and constitutes excessive force. There was no need to maintain or restore order nor any need to prevent Heather from harming herself or others.

45.     Heather was then placed in solitary confinement per Nurse Cooper's instruction and as ratified by Defendant Warden Eric Ivey. Warden Ivey ordered Heather to be placed in solitary confinement for five days. Heather was placed in isolation without a hearing. Her access to visits, mail, and calls with friends and family were terminated during this period. In addition, she was barred from all recreation activities and from accessing commissary purchases other than hygiene items.

46.     This use of solitary confinement was discriminatory and used in response to Heather's disability, constituted unconstitutional conditions of confinement, was a violation of Heather's right to due process, is a well-known cause of psychic decompensation, and caused Heather to suffer psychic and emotional injury.

47.     Upon information and belief, no investigation was conducted and no discipline was issued to Defendants Yeshak, Schwartz, Cooper, or Ivey for their misconduct.

48.     Following this event, Heather was placed in segregated housing without due process. Heather's access to visits, mail, and calls with friends and family were terminated during this period. In addition, she was barred from all recreation activities and from accessing commissary purchases other than hygiene items.

49.   This use of solitary confinement was discriminatory and used in response to Heather's disability, constituted unconstitutional conditions of confinement, was a violation of Heather's right to due process, is a well-known cause of psychic decompensation, and caused Heather to suffer psychic and emotional injury.

**February 20, 2018**

50.   On February 20, 2018, Heather remained in mental health crisis and therefore remained disabled. She had been without her proper medication for some time, and was delusional and talking to herself in her cell. She required adequate accommodations in light of her psychiatric disability.

51.   Correctional staff arrived outside her cell. The cell block was quiet. At that time, Heather was not audible nor disrupting any activity in CCCC. There were no indications of injury-to-self conduct occurring inside her cell.

52.   Nonetheless, a correctional officer read out a form, stating that Heather would be placed in a restraint chair for "spitting on her door" and "loud, disruptive, abusive language."

53.   Defendants Correctional Officer Ronita Sandifer and Corporal Walsh had decided that Heather should be placed in a restraint chair.

54.   However, contradicting these claims and justifications for the use of the restraint chair, when correctional staff including Sandifer and Walsh opened or were present for the opening of her cell door, Heather was silent and compliant. She exited the cell without issue.

55.   Defendants Correctional Officers Frederick Barthany and Barry Hickerson placed Heather in a restraint chair. Heather was compliant as they strapped her in and did not engage in any conduct indicating risk of harm to herself or others.

56.     Heather was placed in a restraint chair on this occasion for "acting out and saying very mean things" toward Correctional Officers Ronita Sandifer and Corporal Walsh.

57.     Clearly delusional, Heather was nonetheless compliant and spoke to officers calmly as they restrained her and began to wheel her away.

58.     There was no lawful basis to use the restraint chair under these circumstances, and its use was punitive, retaliatory, and discriminatory on the basis of Heather's disability, and constitutes excessive force. There was no need to maintain or restore order nor any need to prevent Heather from harming herself or others.

59.     Multiple officers—including Barthany, Hickerson, Sandifer, Walsh, and others—were present during this event and observed or had reason to know excessive force would be used. None of them intervened to prevent this use of excessive force despite having the opportunity and means to do so.

60.     Upon information and belief, no investigation was conducted and no discipline was issued to Defendants Sandifer, Walsh, Barthany, or Hickerson for their misconduct.

61.     Heather remained in the restraint chair for approximately six and one-half hours. While she was restrained, a correctional officer used excessive force and pulled her hair and officers harassed Heather and tried to instigate Heather to lash out, causing her to suffer physical and emotional pain and suffering.

**February 21, 2018**

62.     On February 21, 2018, as part of the pending case against Heather and based on interactions with Heather, Dr. Joy Stankowski evaluated Heather's psychiatric state and issued a report concerning her mental illness and competence. Dr. Stankowski found that Heather's mental state rendered her incompetent to stand trial.

63.     Also on this date, without a hearing and in response to her alleged conduct the day before, and in addition to the unjustifiable use of the restraint chair, Heather was sentenced to twenty days in isolation by Sergeant Christopher. Christopher deemed her conduct as violating CCCC rules concerning "disorderly conduct/refuse orders in emergency" and "major disruptive conduct." Her access to visits, mail, and calls with friends and family were terminated during this period. In addition, she was barred from all recreation activities and from accessing commissary purchases other than hygiene items.

64.     This use of solitary confinement was discriminatory and used in response to Heather's disability, constituted unconstitutional conditions of confinement, was a violation of Heather's right to due process, is a well-known cause of psychic decompensation, and caused Heather to suffer psychic and emotional injury.

65.     Upon information and belief, no investigation was conducted and no discipline was issued to Defendant Christopher for his misconduct.

**March 9, 2018**

66.     On March 9, 2018, Heather was told by correctional officers to get ready for a visit with her attorney.

67.     Heather remained in a decompensated mental state on that date and had a right to adequate accommodations for her psychiatric disability.

68.     Defendant Corporal Robert Moore handcuffed Heather. As Moore cuffed her, Heather was upset that she was not receiving medical care for the injuries she sustained in the assault on her first day in the Jail. She began yelling and cursing at him. She used racist language and called him the N-word.

69.     Defendant Moore ordered Heather to stop talking.

70.     Defendant Moore squeezed on Heather's arm as hard as he could and caused her serious harm, leaving a large bruise, constituting excessive force.

71.     Defendants Moore and Officer Derrick Kendall placed Heather into a restraint chair. Kendall had the opportunity and means to prevent this use of force and failed to do so.

72.     Heather was kept in the restraint chair for approximately three hours.

73.     There was no lawful basis to use the restraint chair under these circumstances, and its use was punitive, retaliatory, and discriminatory on the basis of Heather's disability, and constitutes excessive force. There was no need to maintain or restore order nor any need to prevent Heather from harming herself or others.

74.     This use of the restraint chair caused Heather to suffer psychic and emotional pain and injury.

75.     Defendant Moore's conduct during these events caused Heather to suffer physical pain and injury.

76.     Upon information and belief, no investigation was conducted and no discipline was issued to Defendants Moore and Kendall for their misconduct.

77.     Also on this date, without a hearing, Heather was sentenced to five days in isolation by Sergeant Christopher. Christopher deemed her conduct as violating CCCC rules concerning "refusing a direct order," "using obscene or abusive language or gestures," and "major disruptive conduct." Her access to visits, mail, and calls with friends and family were terminated during this period. In addition, she was barred from all recreation activities and from accessing commissary purchases other than hygiene items.

78.     This use of solitary confinement was discriminatory and used in response to Heather's disability, constituted unconstitutional conditions of confinement, was a violation of

Heather's right to due process, is a well-known cause of psychic decompensation, and caused Heather to suffer psychic and emotional injury.

79.     Upon information and belief, no investigation was conducted and no discipline was issued to Defendant Christopher for his misconduct.

**March 13, 2018**

80.     On March 13, 2018, without a hearing, Heather was sentenced to five days in isolation by Sergeant Christopher. Christopher deemed her conduct as violating CCCC rules concerning "refusing a direct order," "major disruptive conduct," and "hoarding medication." Her access to visits, mail, and calls with friends and family were terminated during this period. In addition, she was barred from all recreation activities and from accessing commissary purchases other than hygiene items.

81.     This use of solitary confinement was discriminatory and used in response to Heather's disability, constituted unconstitutional conditions of confinement, was a violation of Heather's right to due process, is a well-known cause of psychic decompensation, and caused Heather to suffer psychic and emotional injury.

**March 14, 2018**

82.     On March 14, 2018, Heather was provided twenty minutes outside of her solitary confinement cell. Defendant Corporal Robert Moore supervised Heather during this out-of-cell time.

83.     Heather remained in a mental health crisis on that date and had a right to adequate accommodations for her psychiatric disability.

84.     Heather attempted to complete a kite to relay her concerns about treatment in the Jail, including excessive force.

85. Heather had a visible, large bruise on her arm on this date.

86. Heather began speaking to Defendant Moore, pointing to her bruise and recalling a prior assault he committed against her during their last encounter on March 9, 2018. Heather used racist language, calling Defendant Moore the N-word.

87. Out of fear from the prior use of force incident, Heather asked Correctional Officer Cardwell to move between her and Defendant Moore because Moore already beat her once.

88. Defendant Moore responded, "You've got 2 seconds, otherwise I'm gonna square you."

89. Moore ordered Heather back to her cell. Correctional Officer Cardwell, who was present in the area, retrieved eyeglasses and a pen from Heather.

90. Moore told Heather, who was in the doorway of her cell, to leave her shoes outside the cell. Heather kicked off one of her shoes. It flew in Moore's direction and hit him.

91. Moore lunged at Heather, punched her in the stomach, and shoved her into her cell well, and she hit her head on the wall. He shoved her onto the ground, subduing her.

92. Moore pulled out his OC spray and paused to call out on the radio.

93. Next, though Moore's body camera is pointing away from Heather, Moore's body camera continued to record audio after this assault. Heather cried out in pain.

94. Defendant Moore is next heard saying, "Kick your shoe off in my face!" Then Moore is heard retaliating by deploying OC spray into Heather's face, even though she was already subdued.

95. Moore continued to spray the OC at Heather's face until he finally got OC spray in her eyes, causing her severe pain.

96. Heather screamed in agony. The OC spray was burning her body, face, and eyes.

97.     Defendant Moore then handed his body camera to Correctional Officer Cardwell, obscuring his actions from that point onward.

98.     Defendant Cardwell was present during this entire attack. Defendant Cardwell failed to intervene to prevent these excessive force events though she both observed or had reason to know excessive force was being used and had the opportunity and the means to prevent it.

99.     Defendant Moore's uses of force and use of OC spray were retaliatory and constituted excessive force.

100.    Afterward, Defendant Moore remarked, "If you wanna fight, then...," indicating his use of excessive force.

101.    Heather was placed in a restraint chair by multiple correctional officers, including Defendants Michael Shaw, Jermaine Clements, Cpl. Brunello, and SRT Smith.

102.    SRT Smith thrusted Heather's head back in the chair in an act of excessive force, causing her pain and suffering.

103.    There was no lawful basis to use the restraint chair under these circumstances, and its use was punitive, retaliatory, and discriminatory on the basis of Heather's disability, and constitutes excessive force. There was no need to maintain or restore order nor any need to prevent Heather from harming herself or others.

104.    Afterward, Defendants Shaw, Clements, Brunello, and Smith transported Heather to the medical unit. On the way there, the OC spray burned Heather's eyes, face, and body. She ached from Moore's assault. Heather repeatedly expressed that she was in severe pain and that she could not breathe. She begged these Defendants to lean her forward to alleviate the pain and to allow her to be able to breathe.

15

105.    Defendants refused to alleviate her pain and instead continued to wheel her, strapped tightly and in pain to the restraint chair.

106.    Defendant Corporal Brunello responded to Heather expressing CCCC policies, customs, and practices, stating, "Protocol says you have to sit in this chair once you've been sprayed."

107.    Defendants and CCCC employees/agents failed to effectively decontaminate Heather from the pepper spray.

108.    Heather remained in the restraint chair for three and one-half hours.

109.    These events all caused Heather to suffer serious physical and emotional pain and injury. The OC spray caused Heather to be unable to open her eyes for several days. She also experienced severe pain about her body and head because of Moore's assault in the cell. She had a bump on her head for months.

110.    Upon information and belief, no investigation was conducted and no discipline was issued to Defendants Moore, Cardwell, Shaw, Clements, Brunello, or Smith for their misconduct.

111.    Also on this date, without a hearing, Heather was sentenced to thirty days in isolation by Sergeant Christopher. Christopher deemed her conduct as violating CCCC rules concerning "threating," "assault," and "major disruptive conduct." Her access to visits, mail, and calls with friends and family were terminated during this period. In addition, she was barred from all recreation activities and from accessing commissary purchases other than hygiene items.

112.    This use of solitary confinement was discriminatory and used in response to Heather's disability, constituted unconstitutional conditions of confinement, was a violation of Heather's right to due process, is a well-known cause of psychic decompensation, and caused Heather to suffer psychic and emotional injury.

**March 16, 2018**

113.     On March 16, 2018, Heather had a pretrial in her pending case. She appeared in court. Based on her accounts and appearance in court, Judge Michael E. Jackson ordered that Heather be evaluated and examined for bruises and injuries.

**March 21, 2018**

114.     On March 21, 2018, Heather remained in mental health crisis and therefore remained disabled. She required adequate accommodations in light of her psychiatric disability.

115.     Heather was delusional on this date.

116.     Defendant Nurse Jones ordered Heather to be placed in a restraint chair.

117.     Defendants Corporal William Winkel and Correctional Officer James Spirakus restrained Heather in a restraint chair.  She remained in the chair for over five hours.

118.     There was no lawful basis to use the restraint chair under these circumstances, and its use was punitive, retaliatory, and discriminatory on the basis of Heather's disability, and constitutes excessive force. There was no need to maintain or restore order nor any need to prevent Heather from harming herself or others.

119.     Upon information and belief, no investigation was conducted and no discipline was issued to Defendants Winkel, Spirakus, or Jones for their misconduct.

### Heather Bottum Was Subjected to Discrimination, Denial of Opportunities, and Rights Violations in CCCC Custody

120.     Heather is a qualified person with a disability and is handicapped under the A.D.A. and Rehabilitation Act.

121.     CCCC is subject to the A.D.A. and receives federal financial assistance.

122.     Throughout the course of her time in County custody—including but not limited to the use of solitary confinement, restraint chair use, and disciplinary segregation—Heather was

denied the opportunity to participate in or benefit from Defendants' services, programs, and activities, in which she was otherwise qualified to participate, and was otherwise discriminated against by Defendants by reason of her disability.

123.    Defendants failed to make adequate accommodations for Heather in light of her disability in the course of the events outlined in this complaint.

124.    The repeated use of solitary confinement/isolation was discriminatory and used in response to Heather's disability, constitutes unconstitutional conditions of confinement, was a violation of Heather's right to due process, is a well-known cause of psychic decompensation, and caused Heather to suffer psychic and emotional injury.

125.    Restrictive housing policies and practices, including solitary confinement and isolation discriminatorily implemented against Heather without due process, are a proximate cause of violations of her constitutional rights.

126.    The use of solitary confinement/isolation against Heather was unconstitutional and discriminatory, and was in response to Heather's disability in the form of mental illness.

127.    Heather was denied adequate accommodations for her disability and her housing assignments in CCCC constituted denial of opportunities to participate in or benefit from CCCC services, programs, and activities, in which she was otherwise qualified to participate.

128.    Defendants' actions were without probable cause, unjustified, and objectively unreasonable.

129.    In violating Plaintiff Heather Bottum's Constitutional rights, the individual Defendants engaged in willful, wanton, reckless, and/or negligent conduct. The individual Defendants' conduct was the direct, actual, and proximate cause of Heather's injuries.

130. Defendants acted under color of law and deprived Plaintiff of federally protected rights, in violation of Title 42 U.S.C. §1983.

131. As a direct and proximate result of Defendants' conduct, Heather sustained physical and psychological injuries.

132. The injuries suffered by Heather Bottum were all preventable had Defendants not engaged in illegal conduct in violation of her fundamental rights.

### Unconstitutional Conditions at the Cuyahoga County Corrections Center

133. Defendant Cuyahoga County ("the County") is responsible for the Cuyahoga County Corrections Center (CCCC), including the care and treatment of Detainees/Inmates—like Heather Bottum—in custody therein. The County is required to ensure that the policies, practices, and customs of the CCCC comply with federal and Ohio law concerning the treatment of persons in custody.

134. Unconstitutional and deplorable conditions in the CCCC are a historic problem. Defendants have long been on notice of—and have even taken action to worsen—these conditions, and have long been on notice of the incompetent supervision and management of the CCCC.

135. The CCCC has been subjected to federal court monitoring at least twice in response to unconstitutional conditions of confinement within the jail.

136. The County's track record of operating the CCCC demonstrates continued indifference and longstanding, systematically unconstitutional operational procedures.

137. CCCC today operates in complete crisis. Upon information and belief, at least nine people died in CCCC and over 55 people attempted suicide while in CCCC custody in 2018. The rates of in-custody deaths, assaults by correctional officers, deprivations of basic human rights, and safety of Detainees/Inmates and staff alike have all reached emergency levels.

138.     Detainees/Inmates and their families have raised innumerable concerns and complaints about deplorable conditions. Some CCCC staff have quit their jobs in protest. Other stakeholders, including judges in the Cleveland Municipal Court and Cuyahoga Common Pleas Court, have expressed serious concern over jail conditions and the manner in which the facility is being operated.

139.     As of November 2017, the Ohio Department of Rehabilitation and Corrections' (ODRC) Bureau of Adult Detention inspection found CCCC was not in compliance with Ohio's Minimum Standards for Adult Detention Centers. (ODRC Bureau of Adult Detention Report attached as Exhibit 1.)

140.     Likewise, the Pretrial Justice Institute (PJI) found in 2017 that CCCC was overcrowded. The PJI report found that on average, CCCC has been operating at over 100% capacity for four of the past five years. (*See* Pretrial Justice Institute, "Enhancing Pretrial Justice in Cuyahoga County: Results from a Jail Population Analysis and Judicial Feedback," September 2017, available at https://university.pretrial.org/HigherLogic/System/DownloadDocument File.ashx?DocumentFileKey=c4587ef2-8416-18fe-e19d-b188d3691e93&forceDialog=0.)

141.     Further, the Cuyahoga County Bail Task Force found in March 2018 that Inmates/Detainees remain in CCCC custody for unnecessarily long periods of time.

142.     The County has long been on notice of overcrowding and medical and mental health issues since at least 2017.

143.     Further, the United States Marshals Service (USMS) issued a report on November 21, 2018 condemning the conditions in the CCCC. This report documented numerous failings discovered in USMS's thorough review of conditions, policies, and practices at CCCC. The report

concluded that conditions in CCCC are inhumane and dangerous for both Inmates/Detainees and corrections officers. (USMS Report attached as Exhibit 2).

144. The USMS Report found CCCC deficient in, *inter alia*:

    a. Failure to utilize generally-accepted best practices for Use-of-Force teams to ensure staff and Detainee/Inmate safety;

    b. Failure to tag and label as evidence all video tapes involving use-of-force incidents;

    c. Failure to require all persons involved in use-of-force incidents to complete written reports;

    d. Failure to track the frequency and cumulative length of Restrictive Housing Unit (RHU) placement;

    e. Failure to provide Detainees/Inmates with disabilities with necessary accommodations, including access to all services and programs such as outside recreation;

    f. Failure to ensure proper certifications by all medical unit staff;

    g. Failure to implement a proactive program to discuss and implement individually-tailored plans for special needs patients which include, but are not limited to, developmentally disabled individuals, frail/elderly individuals, individuals with physical impairments, serious mental health needs, and juveniles;

    h. Failure to provide intensive clinical mental health treatment to Detainees/Inmates with stable conditions who are housed in RHU during the entirely of their stays in RHU;

      i.   Failure to train annually on safety/security/fire/medical procedures and supervision of offenders.

145.    The USMS report found that CCCC is severely overcrowded and identified 96 corrections officer vacancies, indicating severe understaffing. The report states, "as a result of the high vacancy rate and excessive staff call outs, the CCCCs daily operation is greatly impacted regarding provision for detainees'/inmates' basic needs."

146.    The USMS review team also observed correctional officers verbally abusing and aggressively interacting with Detainees/Inmates, and observed aggressive conduct and abusive, explicit language directed at Detainees/Inmates by correctional officers.

147.    A strong threat of retaliation faces anyone in the custody of Cuyahoga County who comes forward with information about the conditions at CCCC.

148.    The USMS further found that Detainees/Inmates assigned to "No Contact Housing" are confined for up to 27 hours at a time, are denied daily access to showers and recreation, and are denied toothbrushes, toothpaste, toilet paper, and razors or barbering.

149.    The USMS report also found that Inmates/Detainees are subject to up to 30-day disciplinary isolation without disciplinary hearings in violation of their Fifth and Fourteenth Amendment Due Process rights.

150.    Further, as evidenced in the USMS report and inmates' and detainees' accounts—including Heather Bottum—CCCC is in violation of the Ohio minimum jail standards, as defined in Ohio Admin. Code § 5120:1-8. These violations include, but are not limited to:

      a.   Failure to limit use of force to "the amount of force necessary to control a given situation," where "in no event is physical force used as punishment";

b. Failure to arrange for all levels of health care, including ongoing mental health care, and failure to assure quality, accessible, and timely services for inmates;

c. Failure to ensure that all health and mental health personnel are appropriately credentialed, with verification of current credentials on file at the facility;

d. Failure to provide a daily procedure whereby inmates have an opportunity to report medical and mental health complaints through health-trained personnel, or for urgent matters, to any jail employee, along with failure to provide a grievance system for medical and mental health treatment, where daily complaints and grievances are addressed in a timely manner, recorded and maintained on file, reviewed daily by a qualified health care personnel and treatment or follow-up are provided as necessary;

e. Failure to maintain accurate health/mental health records in written or electronic format;

f. Failure to ensure that disciplinary measures do not include corporal punishment or withholding food;

g. Failure to implement disciplinary hearings and to afford an opportunity to appeal disciplinary actions;

h. Failure to ensure that administrative segregation is not used as a penalty;

i. Failure to ensure no retaliation by staff for inmate grievances.

151. Compounding these violations, CCCC's grievance system is broken, leaving Detainees/Inmates—including Heather Bottum—with no functional avenue to seek redress of their serious needs and legitimate complaints concerning conditions of confinement and rights violations, depriving them of due process. Detainees'/Inmates' complaints, kites, and grievances

are not delivered and/or go unanswered. Their complaints remain unaddressed, and their suffering continues unabated.

152.    Ultimately, Heather Bottom was abused by CCCC correctional staff in light of and as a result of these and other deficiencies. Despite her clear need for intensive mental health care and her obvious psychiatric disability, Heather was repeatedly subjected to retaliatory and discriminatory uses of force, restraint, and segregated housing.

153.    The abuses committed against Heather Bottom as described in this complaint occurred while the County had notice of the unconstitutional and unlawful conditions of confinement within the walls of the CCCC.

154.    The unconstitutional acts described in this complaint are part of an ongoing pattern of misconduct within the CCCC by its employees/agents, including, *inter alia*, unlawful use of the restraint chair, OC spray, physical excessive force, and segregated housing against, *inter alia*, Chantelle Glass, Cortez Tyree, Corrionne Lawrence, Charielle Glaze, Terrence Debose, Michael Roarty-Nugent, Daniel Ford, Jr., Margaret Jackintell, Antoine Blackshear, Joseph Sawyer, and countless others.

155.    Gary Brack, former Director of Ambulatory Care at CCCC, spoke out against the conditions at CCCC at a May 2018 Cuyahoga County Council meeting. Brack blamed former Director of Regional Corrections Kenneth Mills "for meddling in jail healthcare, obstructing the hiring of nurses and creating an unsafe and environment for staff by scaling back security in the jail's medical unit." (*See* Adam Ferrise, "Ex-Cuyahoga County Jail Supervisor Subpoenaed to testify before Grand Jury", *Cleveland.com* (Dec. 10, 2018), available at https://www.cleveland.com/metro/2018/12/ex-cuyahoga-county-jail-medical-supervisor-subpoenaed-to-testify-before-grand-jury.html.)

156.    Rather than launching an investigation into the medical care crisis at the CCCC, or investigating whether Mills was fit to continue in the director position, Defendant Budish removed Gary Brack because Brack was outspoken and critical against Mills.

157.    County spokeswoman Mary Louise Madigan characterized this conflict, noting that "Armond [Budish] did have a meeting at Metro. It was clear that Mr. Brack and the jail director, Ken Mills, didn't work well together, and we asked that he not be returned to his position at the jail." (*See* Courtney Astolfi and Adam Ferrise, "Budish Personally Requested Ouster of County Jail's Medical Supervisor Who Criticized Jail Administration", *Cleveland.com* (Dec. 13, 2018), available at https://www.cleveland.com/metro/2018/12/budish-personally-requested-ouster-of-cuyahoga-county-jails-medical-supervisor-who-criticized-jail-administration-sources-say.html.

158.    After Brack's appearance at the May 2018 County Council meeting, at least seven inmates died in Cuyahoga County's custody within a span of barely four months, including inmates likely not receiving proper psychiatric and/or medical care.

159.    Though County Executive Armond Budish has publicly stated that CCCC is the largest mental health provider in Ohio, upon information and belief, at the time Heather Bottom was in custody, CCCC did not have a staff psychiatrist starting in April 2018 and only one nurse practitioner administered mental health care 10 hours a day, four days a week. CCCC did not offer any mental health care for the rest of the time.

160.    Lack of adequate staffing of corrections officers further exacerbates the denial of access to medical and mental health care because there are not sufficient corrections officers to escort Detainees/Inmates to and from the medical and mental health units.

161.    At the time Heather Bottom was in custody, Detainees/Inmates with serious mental health and medical needs were denied proper care and necessary medication and/or treatment when they entered CCCC facilities.

162.    In May 2018, Marcus Harris, former jail nursing director, stated that he quit his job at CCCC in January amid inmate safety and ethics concerns. He believes the conditions at CCCC were so unsafe that "every day when [he] went to work [he] had to wonder if someone was going to be dead or assaulted." (*See* Courtney Astolfi, "Inmates deprived of proper medical care under Cuyahoga County jail director, former nursing supervisor says," *Cleveland.com* (May 31, 2018), available at https://www.cleveland.com/metro/index.ssf/2018/05/inmates_deprived_of_proper_med.html.)

### CCCC Detainees/Inmates with Disabilities Are Regularly Denied Necessary Accommodations

163.    Defendants incarcerate and serve significant numbers of individuals with disabilities as that term is defined in the ADA and the Rehabilitation Act, including those with psychiatric disabilities like Heather Bottum.

164.    Defendants routinely fail to provide Detainees/Inmates with accommodations to ensure equivalent access to programs and services offered at CCCC facilities.

165.    Defendants' failure to accommodate Detainees/Inmates with disabilities not only denies them access to programs and services, but also puts them at risk of injury or victimization by other detainees/inmates and by CCCC staff. Moreover, Defendants' failure to accommodate Detainees/Inmates with disabilities results in the provision of inadequate health care and the violation of detainee/inmates' due process rights.

166.    Defendants fail to maintain proper records and tracking regarding identification of Detainees/Inmates with disabilities and related accommodations. CCCC staff are not adequately

trained in how to identify and track individuals with disabilities, including mental health conditions, nor are they trained regarding the provision of adequate accommodations. As a result, Defendants discriminate against Detainees/Inmates with disabilities by denying them accommodations, access to CCCC programs, services, and activities, and placing them at risk of injury or exploitation, or by withdrawing without justification accommodations that have already been provided.

167.    Defendants do not provide an effective or functional grievance system for Detainees/Inmates with disabilities or a method for Detainees/Inmates with disabilities to mark their grievance as disability-related.

168.    Defendants do not provide Detainees/Inmates with adequate notice of how to request reasonable accommodations for their disabilities. As a result, Detainees/Inmates with disabilities are not informed of any specific process for complaining about disability discrimination or requesting disability accommodations.

169.    Defendants lack adequate policies, procedures, practices, training, and supervision for staff concerning how to respond to Detainees/Inmates with disabilities requesting accommodations through means other than the grievance process.

170.    Further, Defendants place Inmates/Detainees—such as Heather Bottum—with psychiatric disabilities in isolation and restrictive housing in violation of the ADA.

**FIRST CLAIM FOR RELIEF:**
**42 U.S.C. § 1983 Claim for Unconstitutional Seizure**
**Against Defendants Yeshak, Schwartz, Sandifer, Walsh, Barthany, Hickerson, Moore,**
**Kendall, Cardwell, Shaw, Clements, Smith, Brunello, Jones, Winkel, and Spirakus**

171.    All of the foregoing paragraphs are incorporated as though fully set forth here.

172.    The actions of Defendants Yeshak, Schwartz, Sandifer, Walsh, Barthany, Hickerson, Moore, Cardwell, Shaw, Clements, Smith, Brunello, and other agents/employees of

27

CCCC, as alleged in the preceding paragraphs, violated Heather Bottum's rights under the Fourth Amendment to the United States Constitution to be secure in her person against unreasonable seizure, and her right to due process under the Fourteenth Amendment to the United States Constitution, and caused the injuries alleged in this complaint.

173.    Heather Bottum was subjected to the use of excessive force in violation of her Fourth Amendment rights.

174.    Defendants further had the duty and opportunity to intervene to protect Heather Bottum and to prevent the use of excessive force against her, yet they did nothing to assist her or prevent the brutality meted out by fellow officers.

175.    Defendants' conduct during and after these uses of force constitutes cruel and unusual punishment in violation of Heather Bottum's constitutional rights.

176.    Defendants' actions as alleged in this count of the complaint were the direct and proximate cause of the constitutional violations set forth above and of Heather Bottum's injuries.

177.    Defendants are jointly and severally liable for this conduct.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
### Against All Individual Defendants

178.    All of the foregoing paragraphs are incorporated as though fully set forth here.

179.    The conduct of Defendants and other CCCC employees/agents, as alleged in the preceding paragraphs, violated the rights guaranteed to Plaintiff Heather Bottum under the Fourth and Fourteenth Amendments to the United States Constitution, and caused the injuries alleged in this complaint.

180.    The policies, practices, and customs of the CCCC carried out by Defendants as alleged in the preceding paragraphs violated Plaintiff's basic human rights and dignity, and her

right to be free from unconstitutional conditions of confinement and cruel and unusual punishment under the Fourth and Fourteenth Amendments to the United States Constitution.

181.    Defendants' conduct is the direct and proximate cause of the constitutional violations and injuries to Plaintiff Heather Bottum.

182.    Defendants are jointly and severally liable for this conduct.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fifth Amendment**
**Against Defendants Ivey, Christopher, and Cooper**

183.    All of the foregoing paragraphs are incorporated as though fully set forth here.

184.    The conduct of Defendants Ivey, Christopher, and Cooper and other CCCC agents/employees, as alleged in the preceding paragraphs, violated the rights guaranteed to Plaintiff under the Fifth Amendment of the United States Constitution, which protects against the denial of liberty without due process of law. These violations caused the injuries alleged in this complaint.

185.    Restrictive housing policies and practices without due process are the proximate cause of violations of Plaintiff's constitutional rights.

186.    The CCCC's grievance system is broken, leaving Detainees/Inmates like Heather Bottum with no functional avenue to seek redress of their serious needs and legitimate complaints concerning conditions of confinement and rights violations, depriving them of due process.

187.    Defendants caused Plaintiff tremendous mental and emotional anguish and suffering and is the direct and proximate cause of the constitutional violations and injuries to Plaintiff as set forth above.

188.    Defendants are jointly and severally liable for this conduct.

### FOURTH CLAIM FOR RELIEF
### § 1983 *Monell* claim-
### Against Defendant Cuyahoga County

189.  All of the foregoing paragraphs are incorporated as though fully set forth here.

190.  The actions of the individual Defendants were taken pursuant to one or more interrelated de facto as well as explicit policies, practices and/or customs of the Defendant Cuyahoga County, agents, and/or officials.

191.  Defendant Cuyahoga County, acting at the levels of official policy, practice, and custom, with deliberate, callous, conscious and unreasonable indifference to Heather Bottum's constitutional rights, authorized, tolerated, and institutionalized the practices and ratified the illegal conduct herein detailed, and at all times material to this Complaint the Defendant Cuyahoga County, the Cuyahoga County Corrections Center, its agents, and/or officials had interrelated de facto policies, practices, and customs which include, *inter alia*:

    a.  the failure to properly hire, train, supervise, discipline, transfer, monitor, counsel and/or otherwise control their correctional officers who engage in unjustified use of excessive and/or unreasonable force;

    b.  the implementation of unconstitutional policies—whether written or unwritten or official or unofficial, practices, and customs for use of force against inmates/detainees;

    c.  the failure to properly investigate the use of excessive and unreasonable force against CCCC inmates/detainees;

    d.  the failure to properly hire, train, supervise, discipline, transfer, monitor, counsel and/or otherwise control their correctional officers who engage in unjustified use of excessive and/or unreasonable force via use of restraint chairs;

    e.  the implementation of unconstitutional policies—whether written or unwritten or official or unofficial, practices, and customs for use of restraint chairs against inmates/detainees;

    f.  the failure to properly investigate the use of excessive and unreasonable force via restraint chair use against CCCC inmates/detainees;

g. the failure to properly hire, train, supervise, discipline, transfer, monitor, counsel and/or otherwise control their correctional officers who engage in retaliation;

h. the implementation of unconstitutional policies—whether written or unwritten or official or unofficial, practices, and customs for retaliation against inmates/detainees;

i. the failure to properly investigate retaliation against CCCC inmates/detainees;

j. the failure to properly hire, train, supervise, discipline, transfer, monitor, counsel and/or otherwise control their correctional officers who engage in unjustified use of solitary confinement against inmates/detainees;

k. the implementation of unconstitutional policies—whether written or unwritten or official or unofficial, practices, and customs concerning use of solitary confinement against inmates/detainees;

l. the failure to properly investigate the use of solitary confinement against CCCC inmates/detainees;

m. the code of silence;

n. failing and refusing to correct, discipline, and follow up on deficiencies and violations noted in uses of force, OC spray, restraint chairs, retaliation, and/or solitary confinement;

o. possessing knowledge of deficiencies in the policies, practices, customs and procedures concerning detainees, and approving and/or deliberately turning a blind eye to these deficiencies.

192.   The aforementioned de facto policies, practices, and customs of Cuyahoga County include acts of excessive use of force, solitary confinement, and other willful, wanton, and/or reckless behavior leading to harmful consequences to citizens.

193.   Cuyahoga County has engaged in little or no meaningful investigation or disciplinary action in response to the misconduct of its correctional officers, thereby creating a

culture or climate where CCCC correctional staff can escape accountability for their acts of misconduct with impunity.

194.    This municipal defendant was the moving force behind the conduct of the individual Defendants in violating Heather Bottum's constitutional rights.

195.    The policy, practice, and custom of a code of silence results in correctional officers refusing to report instances of misconduct of which they are aware, including the misconduct described in this complaint, despite their obligation under jail regulations to do so, and also includes correctional officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability or criminal charges, in cases where they or their fellow officers have engaged in misconduct.

196.    The de facto policies, practices and customs of failing to hire, train, supervise, monitor, discipline, transfer, counsel and/or control correctional officer misconduct and the code of silence are interrelated and exacerbate the effects of each other, to institutionalize lying and immunize correctional officers from discipline.

197.    That the unconstitutional actions of the Defendants as alleged in this complaint were part and parcel of a widespread CCCC policy, practice, and custom is further established by the involvement in, and ratification of, these acts by supervisors and County policymakers, as well as by a wide range of other officials, officers, and divisions of the CCCC.

198.    The policies, practices and/or customs alleged in this complaint, separately and together, are the proximate cause of the injuries to Heather Bottum because Defendants had good reason to believe that their misconduct would not be revealed or reported by fellow officers or

their supervisors, and that they were immune from disciplinary action, thereby protecting them from the consequences of their unconstitutional conduct.

199.    But for the belief that they would be protected—both by fellow officers and by Cuyahoga County—from serious consequences, the Defendants would not have engaged in the conduct that resulted in the injuries to Heather Bottum.

200.    The interrelated policies, practices and customs, as alleged in this complaint, individually and together, were maintained and implemented with deliberate indifference, and encouraged and/or caused the Defendants to commit the acts alleged in this complaint against Heather Bottum and her resulting injuries.

201.    Cuyahoga County therefore acted as the moving force behind and was a direct and proximate cause of the violations of Heather Bottum's constitutional rights and all injuries and damages suffered by her.

202.    The constitutional violations and damages to Heather Bottum that occurred as described herein were directly and proximately caused by the unofficial and/or official, tacit and/or expressed policies, customs, and practices, and otherwise unconstitutional policies of authorized policy makers of the Defendants.

### FIFTH CLAIM FOR RELIEF
### ADA and §504 Claim –
### Against Defendant Cuyahoga County

203.    All of the foregoing paragraphs are incorporated as though fully set forth here.

204.    Defendant has been, and is, a recipient of federal funds, and is covered by the mandate of Section 504 of the 1973 Rehabilitation Act (29 U.S.C. § 794). Section 504 requires that persons with disabilities be reasonably accommodated in their facilities, program activities,

and services and reasonably modify such facilities, services, and programs to accomplish this purpose.

205.    Further, Title II of the Americans with Disabilities Act (42 U.S.C. §§12131-12134) applies to Defendant and has essentially the same mandate as that expressed in §504.

206.    The Cuyahoga County Correctional Center is a facility, and its operation comprises a program and service, for §504 and Title II purposes.

207.    Defendant Cuyahoga County failed and refused to reasonably accommodate Heather Bottum's psychiatric disabilities and to modify their jail facilities, operations, services, accommodations and programs to reasonably accommodate her disability, in violation of Title II of the ADA and/or §504, when she was in their custody.

208.    Defendant's failures cost Heather Bottum her safety and wellbeing, and the violations of the ADA and/or §504 are the proximate cause of her physical and emotional injures.

### SIXTH CLAIM FOR RELIEF
### State Law Claim for Negligence - Willful, Wanton and Reckless Conduct against all Individual Defendants

209.    All of the foregoing paragraphs are incorporated as though fully set forth here.

210.    Defendants acted negligently when they violated their duty to exercise due care for Heather Bottum.

211.    Defendants committed the acts alleged in this complaint in a reckless, willful and/or wanton manner while working as correctional officers at the CCCC.

212.    Defendants' misconduct directly and proximately caused the injuries and damages suffered by Heather Bottum as described above.

213.    Defendants are jointly and severally liable for this conduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands that judgement be entered in her favor on all counts and prays the Court award the following relief:

A.    Compensatory damages in an amount exceeding the jurisdictional amount in controversy requirement, to be determined at trial for the violation of Plaintiff's rights;

B.    Punitive damages in an amount to be determined at trial for the Defendants' willful, wanton, malicious, and reckless conduct;

C.    Declaratory and injunctive relief against Cuyahoga County enjoining unlawful policies, practices, and customs and ordering the institution of policies, procedures, and training for the Cuyahoga County Correctional Center to bring them into compliance with constitutional standards;

D.    Attorneys' fees and the costs of this action pursuant to law; and

E.    All other relief which this Honorable Court deems equitable and just.

### A JURY IS REQUESTED TO HEAR THIS MATTER.

Respectfully submitted,

*/s/Jacqueline Greene*
Jacqueline Greene (0092733)
Sarah Gelsomino (0084340)
Terry Gilbert (0021948)
FRIEDMAN & GILBERT
50 Public Square, Suite 1900
Cleveland, OH 44113
T: (216) 241-1430
F: (216) 621-0427
jgreene@f-glaw.com
sgelsomino@f-glaw.com
tgilbert@f-glaw.com

Dated: February 7, 2020           *Counsel for Plaintiff*